HARBOR LAND COMPANY v. TOWNSHIP OF GROSSE ILE

1. CONTRACTS—DURATION—FAILURE TO STIPULATE—INFERENCE.
   Contracts in which the parties fail to stipulate a period of duration, either because they did not contemplate duration or their intentions toward it cannot be ascertained, give rise to an inference that the parties intended the contract to run for a reasonable time and no longer.

2. CONTRACTS — DURATION — FAILURE TO STIPULATE — REASONABLE TIME.
   Determination of what constitutes a reasonable time for a contract which does not stipulate a period of duration is usually an implication of fact, not of law, derivable from language used by the parties considered in context of subject matter and attendant circumstances, in aid of apparent intent.

3. CONTRACTS—USE OF SEWAGE PLANT—DURATION—FAILURE TO STIPULATE.
   Trial court properly found that a contract between plaintiff land developer and defendant township contained an implied condition that defendant township would continue operation of plain-

REFERENCES FOR POINTS IN HEADNOTES

[1-3, 8] 17 Am Jur 2d, Contracts § 486.
[4-6] 17 Am Jur 2d, Contracts §§ 255, 256.
[7] 5 Am Jur 2d, Appeal and Error § 839.
[9] 22 Am Jur 2d, Damages § 45 et seq.
[10] 17 Am Jur 2d, Contracts §§ 441-447.
22 Am Jur 2d, Damages § 46 et seq.

tiff's sewage treatment plant including the collection of tap-in fees, and that absent a specific period of contract duration, the contract would run for a reasonable time which would encompass the reasonable useful life of plaintiff's plant terminable only when defendant township would be required to install the additional sewage treatment through enlargement or conversion of its own, or of plaintiff's sewage plant.

4. CONTRACTS—PROVISIONS—IMPLIED—EXPRESS.

A contract includes that which must necessarily be implied from the language used and the external facts as well as what is expressly stated.

5. CONTRACTS—IMPLIED TERMS.

Terms of a contract which may be clearly implied from a consideration of the entire contract are as binding as if they were plainly written on the face of the contract.

6. CONTRACTS—IMPLIED PROVISIONS—PERFORMANCE.

Absent an express provision, the law will imply an agreement by the parties to a contract to do and to perform its implied provisions which, according to reason and justice, they should do in order to carry out the purpose for which the contract was made.

7. APPEAL AND ERROR—NONJURY CASE—FINDINGS—REVIEW.

The Court of Appeals will not set aside the findings of fact of a trial judge in a nonjury case unless they are clearly erroneous or the record preponderates against them.

8. CONTRACTS — DURATION — MUNICIPAL CORPORATIONS — MUNICIPAL BOARDS — SUCCESSORS.

The governing board of a municipality may, in the exercise of its business or proprietary powers, enter into valid contracts for water, street lights, gas, etc., which are binding on subsequent boards for a reasonable length of time.

9. DAMAGES—ASSESSMENT—EVIDENCE.

Mathematical precision as to damages is not required in situations of injury where the circumstances make precision impossible.

10. DAMAGES—BREACH OF CONTRACT—AMOUNT.

Object of awarding damages for breach of contract is to award a sum equivalent to the performance of the bargain and to place plaintiff in the situation he would have been in had the contract been fulfilled.

Appeal from Wayne, Cornelia G. Kennedy, J. Submitted Division 1 December 12, 1969, at Detroit. (Docket No. 6,266.) Decided February 26, 1970. Leave to appeal denied October 14, 1970. 384 Mich 765.

Complaint by Harbor Land Company, a Michigan corporation, against the Township of Grosse Ile, a Michigan public corporation, to recover damages for breach of contract. Judgment for plaintiff. Defendant appeals. Affirmed.

*Joseph T. Brennan,* for plaintiff.

*Moll, Desenberg, Purdy, Glover & Bayer,* for defendant.

Before: R. B. Burns, P. J., and Holbrook and V. J. Brennan, JJ.

Holbrook, J. This case involves an action for damages for breach of contract brought in Wayne county circuit court by Harbor Land Company, a Michigan corporation and plaintiff herein, against the defendant Township of Grosse Ile, a Michigan public corporation.

On January 10, 1955 James Rossin and Paul Ringler, directors of plaintiff company and herein referred to as sponsors, entered into a written contract with the township. The contract discloses that the sponsors owned certain undeveloped acreage within the township which they desired to subdivide, develop and improve for residential purposes so as to meet the requirements of the Federal Housing Act and the Michigan State Department of Health pertaining to disposal and treatment of sewage; that the township was without sewers and facilities for sewage treatment and disposal and was,

at the time, financially unable to erect an adequate sewer system and sewage treatment and disposal plant. The sponsors offered to provide sanitary sewers and treatment facilities for 500 homes which would serve all of sponsors' land. The defendant township required the proposed sewage facilities of sponsors to be enlarged so as to serve 875 houses before approving the project. The sponsors complied with the township demands.

The sponsors, pursuant to the contract terms, agreed to provide, at their own expense and upon their own premises, a sewage treatment plant to be approved by the State Health Department, the Wayne County Road Commission, the Board of Health and defendant township, and to convey the same to the township upon satisfactory completion. The contract provided in part that:

"3. * * * If new subdivisions be developed by owners other than the sponsors herein who could use said plant, *then before permission to tie into the plant be given, the new developments shall pay to the sponsors a pro-rata fee for the privilege of such use.* The pro-rata fee to be approved by the township.

"4. When the Department of Health of the State of Michigan shall have issued a construction permit for said plant, then the township will direct the issuance of a building permit to the sponsors for the construction of the plant.

"5. Sponsors will at their expense provide and plant appropriate trees and shrubs for landscaping the site and screening the building in an attractive manner. During the construction of the plant the township will have same inspected periodically, and upon satisfactory completion, the sponsors will convey to the township by warranty deed the land upon which the plant will be situated, plus the necessary land for screening purposes, which deed will be accepted by the township. Said warranty deed will

have a reverter clause, so that if this plant should be abandoned, then the land will revert to the grantors. * * * " (Emphasis supplied.)

The parties entered into a separate operation agreement of same date as the contract.

On January 11, 1955, the sponsors assigned all their right, title and interest in the contract to the plaintiff, and plaintiff did, pursuant to the contract, construct a sewage treatment plant and facilities which, at the insistence of defendant township, were designed to provide a capacity to serve 875 houses instead of the projected 500 houses to be placed on the land of the plaintiff and its predecessors in interest. Upon completion of the plant and facilities, the same were conveyed to the township.

The township board, in accordance with the contract, did, on July 10, 1956, adopt the following resolution:

"RESOLVED AND ADOPTED, that a tapping fee of $200.00 be paid to the Harbor Land Company for any new homes built outside of their subdivision; that the township protect the Harbor Land Company by not permitting anyone to tap into the sewer until they have paid their fee to the Harbor Land Company securing a letter stating that they have paid the fee before any permits be issued to tap."

On September 28, 1965, the township rescinded the foregoing resolution and ceased requiring payment of the agreed tapping fees. On October 18, 1965 the township board voted to abandon plaintiff's Potawatomie Woods treatment plant when a treatment plant to be constructed by defendant became operational. Accordingly, in that year, defendant township did abandon the treatment plant constructed by plaintiff and proceeded to construct a

new township sewer system and treatment plant, into which plaintiff's sewer system was to be connected.

Mrs. Merele E. Solomon, a supervisor for defendant township since April, 1965, testified to the following facts regarding abandonment of plaintiff's plant: the township had been informed by the Water Resources Commission that secondary sewage treatment would be required by 1970 so as to bring the water quality in the area surrounding Grosse Ile Township to a prescribed standard by that date; a stipulation to this effect was signed by the township in March, 1966, several months after plaintiff had been informed of the Township's decision to abandon plaintiff's plant; consultation was had by township board members with the firm of Hubbull, Roth & Clark, consulting engineers, the board apparently acting upon its recommendations as to what should be done to meet the requirements of the Water Resources Commission; and, the board received from the Wayne County Road Commission official in charge of operation of plaintiff's treatment plant a breakdown of operation costs, upon defendant's request, which information was also allegedly considered by the township in determining to abandon plaintiff's plant. Mrs. Solomon testified that, when abandoned, the sewage treatment plant constructed by plaintiff provided the same primary sewage treatment as did the plant later constructed by defendant township.

The case was tried by the Honorable Cornelia G. Kennedy, without a jury. Upon stipulation of the parties, plaintiff's motion for temporary injunctive relief was denied and a temporary restraining order dismissed. In its opinion filed August 5, 1968, the trial court found defendant township in breach of contract and awarded damages to plaintiff. Judgment for $37,000 was entered accordingly on Sep-

tember 5, 1968. Defendant appeals, raising several issues which we restate and consider as follows:

(1) *Did the trial court commit error in finding that defendant township properly entered into a binding contract containing an implied condition that the township would continue operation of plaintiff's sewage treatment plant, including the collection of tap-in fees, during the plant's reasonable useful life?*

The trial court, in accordance with GCR 1963, 517.1, as amended 1969, made findings of fact and conclusions of law thereon. In its opinion the trial court stated its findings in part as follows:

"* * * Plaintiff has alleged, and defendant has admitted, that, 'a sewage treatment plant and facilities providing capacity for approximately 500 homes or 2000 people would have been adequate to serve the needs of the plaintiff, but that the plant was increased in size at the insistence of the defendant township to serve approximately 875 homes and 3500 people and that such increase was a condition precedent imposed by the defendant to their (*sic*) approval of this sewage disposal plant and this contract.' The area to be served was to be bounded by Horse Mill Road, East River Road, Stout Avenue and Canal Thoroughfare.

"Pursuant to the written agreement, Exhibit 1, plaintiff constructed an interceptor sewer most of the length of Church Road and a sewage treatment facility at a total cost of approximately $129,000 and conveyed the same to the township. It thus performed all its undertakings under the Agreement, Exhibit 1. Of this total, $20,995.51 was for the Church Road interceptor. The agreement, Exhibit 1, was implemented by a resolution of the Township Board dated July 10, 1956, * * * .

"Thereafter the township required applicants for building permits in the area covered by the agreement to show evidence that they had paid the $200.00

tap fee to Harbor Land Company before such a permit would be issued for all persons, except lot owners in Rossin-Ringler Subdivision No. 1 and Potawatomie Woods Subdivision which had been developed by plaintiff. During the period prior to September 1965 permits were issued and plaintiff received the $200 fee for each.

"Sometime in 1965 the Township of Grosse Ile undertook to build and put into operation a sewage treatment facility of its own. Initial contracts were let for the area excluding that served by the sewage treatment plant constructed by plaintiff. Subsequently the township determined that it would include the entire island in the area to be serviced by the new facility. It rescinded its resolution of July 10, 1956, abandoned the sewage treatment plant construction by plaintiff, and ceased to collect tap-in fees.

"Plaintiff contends that under the agreement the defendant is required to continue to collect tap-in fees for permits issued in the area between Horse Mill Road, East River Road, Stout Avenue, and Canal Thoroughfare, and that its announced refusal to do so constituted a breach of the agreement. Defendant, on the other hand, contends that the agreement did not require the Township of Grosse Ile to collect these fees for any specified or determinate period, and that it was required to collect the same only so long as new homes actually used the sewage treatment plant, and that the plant could be abandoned by the township at any time for any reason that the township deemed sufficient. Defendant points to the provision that the land on which the treatment plant was built reverts under the terms of the agreement to the plaintiff if the plant was abandoned. It should be pointed out that there is no evidence that the treatment plant was not operating properly at the time it was abandoned or that it could not serve the entire area included in the initial agreement. It was approved by the State of Michigan Health Department before it was ac-

cepted by the township. The township is now required by the Health Department of the State of Michigan to provide secondary treatment of sewage by December 1970. There was no showing that the plant constructed by the plaintiff could not efficiently have been converted or enlarged to include a secondary treatment, nor is there evidence to the contrary.

"The agreement does not state the period of time during which the township will continue to collect tap-in fees or operate the sewage treatment plant. * * * "

Based upon the foregoing findings of fact the court made the following pertinent conclusions of law:

"* * * Having required plaintiff to construct the sewage treatment plant as it did and having by the agreement * * * and the resolution accompanying it provided a manner in which the plant could be paid for, the township could not unilaterally terminate this arrangement without any reason except that some other sewage treatment system might now be more desirable in the opinion of the township board. Such a change of position, if permitted, could occur on the day following the initial agreement and would amount to no undertaking on the part of the township. Thus, unless there was an implied undertaking by the township to operate the facility and collect tax fees during the reasonable useful life of the facility, the township could have terminated the agreement the day following acceptance of the facility and the agreement would lack mutuality. It is clear from all of the testimony that plaintiff did not intend the sewage facility to be a gift to the township. The court finds that the parties intended that the facility would be operated and the fees would be collected for the reasonable useful life of the facility.

"* * * the court is of the opinion that as of December 1970 the township could properly abandon

the use of this sewage treatment facility, since at that time its useful life will be terminated because it does not provide secondary treatment. * * *

"It would avail defendant nothing if, as it contends, it did not make a contract to collect tax fees for any specified period or for a reasonable period. For if it contracted to do nothing the contract would, as stated above, be void for lack of mutuality. * * * "

The parties agree that it is realistic to assume that the contract was not intended to be of perpetual duration, as is evidenced by the provision for reverter of title to the land in the event of abandonment of the plant by the township. However, while defendant township would have this court read the abandonment provision as allowing defendant to abandon the plant at any time, plaintiff contends that that provision was consistent with an implied condition that defendant would operate the plant during its useful life and that that provision merely served to insure that plaintiff, having put up all the money for the contract, would recover the land should defendant abandon the plant at the termination of its reasonable useful life.

In 17A CJS, Contracts, § 385(1), p 457, dealing with the duration of contracts, it is stated:

"* * * if it appears that no termination was within the contemplation of the parties, or that their intention with respect thereto cannot be ascertained, the contract will be terminable within a reasonable time or revocable at will depending upon the circumstances, as discussed infra § 398."

Section 398, p 480 states:

"* * * It has also been held that a contract will be held terminable within a reasonable time or revocable at will, depending on the circumstances,

where no termination date was within the contemplation of the parties, or where their intention in regard thereto could not be ascertained. *So, where a contract states no time of duration, it may be inferred that the parties thereto intended the contract to run for a reasonable time, and no longer.*" (Emphasis supplied.)

The footnote corresponding to the above quoted section provides that:

"What constitutes a 'reasonable time' for which contract will run is usually an implication of fact, and not of law, derivable from language used by parties considered in context of subject matter and attendant circumstances, in aid of apparent intention."

In 17 Am Jur 2d, Contracts, § 486, p 956 it is stated:

"A contract which provides that it is to continue for a more or less indefinite period may be held to continue for a reasonable time under the circumstances. Indeed, it is said to be the general rule that the law implies a reasonable time where the continuation of a contract is without definite duration."[1]

Several cases dealing with the question of the proper time for performance or payment under a contract have been decided by our Supreme Court and by this Court and have held that where a contract is silent in regard thereto, a reasonable time will be implied from all of the facts and circumstances of the particular case.[2]

---

[1] *Ansbacher-Siegle Corp. v. Miller Chemical Co.* (1939), 137 Neb 142, 288 NW 538.

A contract is not terminable at will where a reasonable duration is implied. *Hammond v. C.I.T. Financial Corp.* (CA 2, 1953), 203 F2d 705.

[2] *Stange v. Wilson* (1868), 17 Mich 342; *Ferguson v. Arthur* (1901), 128 Mich 297; *Pierson v. Davidson* (1930), 252 Mich 319; *Siegel v.*

As the trial court properly found in the case at hand, there was no showing that plaintiff's Potawatomie Woods treatment plant was not functioning properly when abandoned, nor that plaintiff's plant could not have been enlarged or converted to include secondary treatment facilities. Considering these facts, the trial court, upon the basis of the foregoing authority, properly ruled that the contract in question was to run for a reasonable length of time; that a "reasonable time" would, under the circumstances, encompass the reasonable useful life of plaintiff's plant; and that the plant's useful life would terminate in the year 1970, by which time the defendant would, under the evidence presented, be required to provide secondary sewage treatment through enlargement or conversion of its own plant or that constructed by plaintiff.

Defendant township asserts that the trial court's finding of an implied obligation on its part to collect tap-in fees during the reasonable useful life of plaintiff's plant was erroneous, reasoning that if an agreement not to abandon the plant was intended, it could have been expressed in the written contract. The fact remains, however, that, *no express provision as to duration* was included within the terms of the contract. In this regard we refer to 17A CJS, Contracts, § 328, pp 282–284, wherein it is stated:

"A contract includes not only what is expressly stated but also what is necessarily to be implied from the language used and external facts, such as the surrounding circumstances; and terms which may clearly be implied from a consideration of the

*Sharrard* (1936), 276 Mich 668; *Brady* v. *Central Excavators, Inc.* (1947), 316 Mich 594; *Duke* v. *Miller* (1959), 355 Mich 540; *Goslin* v. *Goslin* (1963), 369 Mich 372; *Thornton Construction Company, Inc.,* v. *Mackinac Aggregates Corporation* (1968), 9 Mich App 467; *Levine* v. *Johnson* (1968), 10 Mich App 152; *Kiff Contractors, Inc.,* v. *Beeman* (1968), 10 Mich App 207.

entire contract are as much a part thereof as though plainly written on its face.

"In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made. * * * "

This Court will not set aside the findings of fact of a trial judge in a nonjury case unless they are clearly erroneous or unless the record clearly preponderates against the findings of the trial court.[3] We cannot say that the trial court's findings were clearly erroneous.

Defendant further argues that the township board in 1955 had no power to contractually obligate a successor board in 1965 to continue the use of plaintiff's treatment plant during its useful life, reasoning that to so interpret the contract is to deprive the township of its legislative discretion in dealing with sanitation, a "police power" which cannot be bargained away.

The opinion of the trial court, in this regard, stated as follows:

"The Court agrees that the Township could not contract away its legislative discretion or delegate legislative powers. However, this does not prevent it from exercising them and entering into contracts to do so."

---

[3] *Hoffmaster* v. *McNett* (1966), 2 Mich App 709, 712; *Bill* v. *Brown* (1966), 2 Mich App 455, 457; *Teachout* v. *Maiers* (1965), 2 Mich App 69, 73; *Airport Motel Corporation* v. *Burke, Burke, Ryan & Roberts* (1966), 4 Mich App 385, 387; *Tann* v. *Allied Van Lines, Inc.* (1966), 5 Mich App 309, 313; *Burke* v. *Gaukler Storage Company* (1968), 13 Mich App 536, 537. See, also, *Hudson* v. *Enichen* (1944), 308 Mich 79, 84; *Pogletke* v. *Schwanz* (1957), 349 Mich 129, 134; *Mellios* v. *Charney* (1957), 350 Mich 199, 203; and *G. C. Kay Company* v. *Standard Steel Treating Company* (1958), 352 Mich 234, 238, 239.

The power of a municipality's governing board to enter into contracts binding successor boards is considered in 70 ALR at p 795, where it is stated:

"It is generally held that a board may contract for water supply, street lighting, gas supply, and the like, and bind subsequent boards, such contracts being made in the exercise of the city's business or proprietary powers. A contract of this kind, however, must be reasonable in the length of time for which it is to extend."

149 ALR states at p 339:

"Where a board, in the exercise of its proprietary or business powers, enters into a contract for water supply, street lighting, gas supply, flood prevention, sewerage, and the like, the contract will be held valid if reasonable in its terms."[4]

Also, see, 10 McQuillin, Municipal Corporations (3d ed, 1966 Rev), § 29.100, pp 486, 487 and § 29.101, pp 491, 492; *Dohm* v. *Township of Acme* (1958), 354 Mich 447, 450.

The cases cited by defendant are inapposite and therefore not controlling of the case under consid-

---

[4] *Bridgeport Irrig. Dist.* v. *United States* (CA 8, 1930), 40 F2d 827 (writ of certiorari denied in [1930], 282 US 866 [51 S Ct 74, 75 L Ed 766]); *Plant Food Co.* v. *City of Charlotte* (1938), 214 NC 518 (199 SE 712); *Washington Fruit & Produce Co.* v. *Yakima* (1940), 3 Wash 2d 152 (100 P2d 8); *North Newton* v. *Regier* (1940), 152 Kan 434 (103 P2d 873); *Verdigris River Drainage District* v. *State Highway Commission* (1942), 155 Kan 323 (125 P2d 387).

In *Plant Food Co.* v. *City of Charlotte, supra,* this footnote, the city made a ten-year contract with plaintiff, whereby the city agreed to deliver sludge from a sewerage disposal plant, plaintiff agreeing to remove the sludge and pay the city therefor. The court held the contract valid, the court stating at p 520:

"The true test is whether the contract itself deprives a governing body, or its successor, of a discretion which public policy demands should be left unimpaired. It is obvious that a too rigid adherence to the principle would leave the town council nursing a mere theory, in the possession of an important governmental power without practical means for its exercise, and unable to undertake any important public work, since no concern would equip itself and undertake the project when the incoming administration, the product perhaps of political accident, might repudiate the contract at will during its performance."

eration. We rule, upon the basis of the foregoing authority, that the trial court did not commit error in determining that the contract in question was within defendant's power to enter, and that it bound defendant to operate plaintiff's treatment plant and to collect tap-in fees during the reasonable useful life of the facility.

(2) *Was the trial court's award to plaintiff of damages, in the amount of $37,000, excessive?*

Plaintiff's proofs showed that its total out-of-pocket cost of constructing the sewage plant and necessary facilities before turning the same over to the township was approximately $129,000. Plaintiff added to the price of each lot which it developed and sold $200 which represented the proportionate cost of the sewer plant for each lot. Plaintiff assigned part of its land to other developers who subdivided and sold lots for houses which, when connected to the sewer system, paid the $200 tap-in fee. It appears from the record that, up until the time defendant abandoned the plant in 1965, plaintiff received for its plant construction costs, including tap-in fees and extra charges for lots sold by plaintiff, a total of $93,400. As of 1968, the record indicates that 467 houses had been connected to plaintiff's sewage system. The president of plaintiff company, Mr. Harry Lieberman, testified that the $200 tap-in fees, which defendant agreed to collect on behalf of plaintiff before permitting taps to be made into plaintiff's sewer system as actually constructed, were intended, as between the parties, to aggregate sufficient funds to pay plaintiff its investment of approximately $129,000, its operation and maintenance costs under the operation agreement, and interest for the time in which plaintiff's money would be invested in the facility. This testimony was undisputed.

Mr. Lieberman also testified that he had no way of determining what the plant would have cost if it had been constructed to provide service for 2,000 people or 500 homes, which, as plaintiff claims, would have been adequate to serve the sewage needs of its own subdivisions. He stated that the cost of such a plant had never been estimated inasmuch as plaintiff company had not been able to get township approval for the smaller plant.

The trial court stated in its opinion the following, regarding its determination of damages:

"* * * there is considerable vacant property, some of it platted. The number of taps per year from 1958 to 1965 varied from 25 to 46 and averaged 37-1/4. In 1966 there were 30 tap-ins and in 1967 there were 69 in the area included in the agreement. (The area recited in the written agreement extended to and included lots on East River Road and the Court finds that lots on East River Road are included in the terms of the agreement.) This is an average of 48 for each of these years.

"The president of the plaintiff corporation, an experienced real estate developer, testified that the area involved was a good area for home development. If an average for the area for the past 10 years is used, it would be 39 homes per year. Because the higher average which includes the last 2 years may be due in part to the fact that a township sewer was provided, the court will use the smaller average of 37 homes per year. The court finds that plaintiff has established by a preponderance of the evidence that if the defendant had not breached its agreement, plaintiff would in the years 1966 through 1970 have received an average of 37 tap-ins per year or a total of $37,000."

Defendant argues that the maximum amount of plaintiff's loss, and consequent damages, should be the extra cost incurred in construction of the larger

treatment plant which it required plaintiff to build. In the absence of such evidence as to the extra cost of the larger plant, defendant contends, plaintiff's proofs did not support the finding of $37,000. Defendant does not, however, cite any authority to support this contention.

In *Gongola* v. *Yaksich* (1966), 3 Mich App 676, cited by plaintiff, this Court, as to breach of contract damages, stated at pp 680, 681:

"* * * When testimony such as given in this case makes the exact ascertainment of damages impossible the Michigan Supreme Court has said:

'We do not, * * * in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable.' *Stimac* v. *Wissman* (1955), 342 Mich 20, 28.

"The object of awarding damages in cases of breach of contract is to award a sum 'which is the equivalent of performance of the bargain * * * to place the plaintiff in the position he would be in if the contract had been fulfilled.' McCormick, Damages, § 137, p 561. The trial court in its award has attempted to confer upon the plaintiff the benefits contemplated by both parties when the contract was made, which have been denied the plaintiff as a consequence of defendant's breach. The method utilized by the trial court in assessing damages was proper and reasonable."

See, also, *Brodsky* v. *Allen Hayosh Industries, Inc.* (1965), 1 Mich App 591; *Tann* v. *Allied Van Lines, Inc.* (1966), 5 Mich App 309.

Plaintiff presented for the trial court's consideration a theory of damages which, if allowed, would have produced an award of $109,862. The court rejected plaintiff's theory and determined that, upon the record in this cause, an award of $37,000 was

proper. The determination of damages was for the trial judge sitting as the trier of fact.

We conclude that, under the evidence presented in this case, the trial court's award of damages was reasonable and proper.

Affirmed. Costs to plaintiff.

All concurred.